**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 3:23-CV-1887-O** |
| **v.** | § | |
| | § | |
| **WALTER DUNNING LARRICK, III and CAMBRIDGE FINANCIAL ADVISORS, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**ORDER GRANTING MOTION FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, RESTITUTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST DEFENDANTS, WALTER DUNNING LARRICK, III, AND CAMBRIDGE FINANCIAL ADVISORS LLC**

On August 23, 2023, Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), filed a Complaint for Injunctive Relief, Civil Monetary Penalties, Restitution, and Other Equitable Relief (the "Complaint") in the above-captioned action against Defendants, Walter Dunning Larrick, III ("Larrick") and Cambridge Financial Advisors LLC ("Cambridge"), seeking civil monetary penalties, restitution, injunctive and other equitable relief for violations of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1-26, and its implementing regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2024) (ECF No. 1). The Complaint alleged that Cambridge engaged in acts and practices in violation of Sections 4b(a)(1)(A)–(C), 4c(b), 4o(1), and 4m(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)–(C), 6c(b), 6o(1), and 6m(1) and Regulations 4.20(a)(1), (b) and 33.10, 17 C.F.R. § 4.20(a)(1), (b) and 33.10 (2024), and that Larrick engaged in acts and practices in violation of Sections 4b(a)(1)(A), (C) and 4c(b), 7 U.S.C. §§ 6b(a)(1)(A), (C) and 6c(b), and Regulation 33.10, 17 C.F.R. § 33.10 (*id.*).

On August 24, 2023, the Court issued a Summons in a Civil Action ("Summons") as to each Defendant (ECF No. 10). Thereafter, the CFTC made numerous unsuccessful attempts to serve Defendants; subsequently, on July 25, 2024, the CFTC moved for an order authorizing service of via alternative means (ECF No. 16). On October 23, 2024, the Court granted the CFTC's motion for alternative service and ordered the CFTC, pursuant to Federal Rule of Civil Procedure 4(f)(3), to serve Defendants via alternative means (ECF No. 17). On January 17, 2025, the CFTC filed a Notice of Proof of Alternative Service demonstrating that, as of December 11, 2024, the CFTC had completed service on Defendants via the alternative means specified in the Court's October 23, 2024 Order (ECF No. 18).

Defendants failed to appear or answer the Complaint within the time permitted by Fed. R. Civ. P. 12(a)(1). Accordingly, on January 31, 2025, the CFTC filed a request for Clerk's Entry of

Default (ECF No. 19) requesting that the Clerk of Court enter a Certificate of Default against Defendants and on February 4, 2025, the Clerk entered default against Defendants (ECF No. 20).

The CFTC has now moved this Court to grant final judgment by default against Defendants, order permanent injunctive relief, and impose restitution and a civil monetary penalty. The Court has carefully considered the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's memorandum and declaration filed in support of its motion, the record in this case, and the Court being otherwise advised in the premises, it is hereby:

**ORDERED** that Plaintiff's Motion for Final Judgment by Default, Permanent Injunction, Restitution, Civil Monetary Penalties, and Other Equitable Relief against Defendants is **GRANTED**. Accordingly, the Court makes the following findings of fact and conclusions of law to support entry of final judgment by default as requested against Defendants pursuant to Sections 6c and 6d of the Act, 7 U.S.C. § 13a-1, as set forth herein.

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Findings of Fact

**The Parties**

1. Plaintiff, Commodity Futures Trading Commission, is an independent federal regulatory agency charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2024). (ECF No. 1 at ¶ 14.)

2. Defendant Walter Dunning Larrick, III, is a resident of Corpus Christi, Texas and is the sole owner of Cambridge Financials and signatory for its bank accounts. Larrick has never been registered with the Commission. Larrick is currently residing in Costa Rica. (*Id.* at ¶ 15.)

3. Defendant Cambridge Financial Advisors, LLC, is a Texas Limited Liability Company formed on September 10, 2020. Cambridge's address is listed in a corporate filing as

Fredericksburg, TX. According to its website, Cambridge also maintained a virtual office in the United Kingdom. Cambridge has never been registered with the Commission. (*Id.* at ¶ 16.)

**Cambridge Fraudulently Solicited Pool Participants**

4. During the Relevant Period, Cambridge, by and through its employees and agents, engaged in a scheme to fraudulently solicit persons ("Pool Participants") to deposit money for the purposes of trading futures and options. (*Id.* at ¶ 17.)

5. On September 10, 2020, Larrick registered the entity Cambridge Financial Advisors LLC with the Texas Secretary of State and listed himself as its registered agent. (*Id.* at ¶ 18.) On November 02, 2020, Larrick opened a Chase Performance Business Checking account under the name of Cambridge Financial Advisors LLC ("Chase Account"). (*Id.* at ¶ 19.) Larrick was the sole signatory on the Chase Account. Shortly thereafter, on January 8, 2021, Larrick opened another account in the name of Cambridge Financial Advisors LLC, this time a Navigate Business Checking account with Wells Fargo Bank, N.A. ("Wells Fargo Account"). The application for the Wells Fargo Account identifies Larrick as the "Sole Owner" and the "Owner with Control" of Cambridge. Larrick is the sole authorized signatory on the Wells Fargo Account. (*Id.*) On September 15, 2021, Larrick opened a third bank account in the name of Cambridge Financial Advisors LLC—a Bank of America, N.A. Business Advantage Checking ("BOA Account," collectively with the Chase Account and Wells Fargo Account the "Cambridge Bank Accounts" or the "Pool"). The application for the BOA Account identifies Larrick as the "Managing Member." Larrick is the sole signatory on the BOA Account. (*Id.*)

6. Prospective Pool Participants were initially contacted via telephone, including, on some occasions, unsolicited "cold calls," by individuals purporting to be sales associates or traders

working on behalf of Cambridge. These telephone calls were made by individuals working for call centers operated by as-yet unidentified coconspirators located in Costa Rica. (*Id.* at ¶ 20.)

7. To entice prospective Pool Participants to deposit money with Cambridge for the purpose of trading futures and options, Cambridge falsely and fraudulently represented during these telephone calls that, inter alia:

> (i) Cambridge had been in business for over 20 years and had a history of providing clients with profitable returns;
>
> (ii) Cambridge was a U.S.-based company and Pool Participants' funds would be maintained by Cambridge in a bank account located in the U.S.;
>
> (iii) Pool Participants' funds would be used to trade futures and options, including natural gas, oil, and gold, which Cambridge purportedly purchased in large "blocks" and at a discounted rate;
>
> (iv) Cambridge employed a hedging strategy that ensured the profitability of its trading regardless of whether the price of the underlying commodity rose or fell;
>
> (v) Cambridge would receive a commission of 15% of trading profits; and
>
> (vi) Pool Participants could withdraw their funds at any time.

(*Id.* at ¶ 21.)

8. On some occasions Cambridge also provided marketing materials to potential Pool Participants which indicated that Cambridge was "represented by a team of professionals with extensive experience in the markets," that it "specialize[d] in the futures and options markets," and that in 2019 it had "made a positive revenue on approximately 85% of the trading days with remaining 15% of trading showing mostly relatively immaterial negative revenue." (*Id.* at ¶ 22.) In furtherance of its scheme, Cambridge also maintained a website, cambridgefinancials.com. The website described Cambridge as a "leading commodities brokerage firm" that is "current and involved in trading all commodities." (*Id.* at ¶ 23.) In addition, on at least one occasion, Cambridge contacted a prospective Pool Participant while posing as a representative of the Securities and

Exchange Commission ("SEC") for the purported purpose of providing "independent verification" that Cambridge was not engaged in fraud. (*Id.* at ¶ 24.)

9. These statements were false. (*Id.* at ¶ 25.) Defendants did not use any Pool Participant funds to trade futures or options. Rather, the majority of Pool Participants' funds were transferred offshore to bank accounts in Costa Rica. Certain other Pool Participants' funds were used by Defendants to pay for Larrick's personal living expenses or to make payments to other Cambridge Pool Participants in a manner akin to a Ponzi scheme. Additionally, Defendants repeatedly failed to return Pool Participant funds upon request. (*Id.*)

10. Cambridge also, willfully or with reckless disregard for the truth, failed to disclose material information, including that:

> (i) Cambridge was not registered with the Commission and thus was not legally authorized to trade futures or options with Pool Participant funds;
>
> (ii) Pool Participants' funds were not used to trade futures or options as promised; and
>
> (iii) the majority of Pool Participant funds were misappropriated and used for purposes other than trading futures and options.

(*Id.* at ¶ 26.)

11. Based on Cambridge's material misrepresentations and omissions, at least 70 persons deposited at least $3,644,817.52 into Cambridge Bank Accounts for purposes of trading futures and options. (*Id.* at ¶ 27.)

**Defendants Misappropriated Pool Participant Funds**

12. Once prospective Pool Participants indicated their desire to trade through the Cambridge Pool, Cambridge would send, via email, trading account funding instructions, which directed Pool Participants to send funds by wire or check to one of the Cambridge Bank Accounts, which were controlled and managed by Larrick. (*Id.* at ¶ 28.) Rather than use Pool Participants'

funds for trading futures and options, as Cambridge had represented it would, Defendants instead misappropriated the majority of the money. (*Id.* at ¶ 29.)

13. Of the $3,644,817.52 deposited by Pool Participants, $2,831,748, was sent offshore to various bank accounts in Costa Rica. (*Id.* at ¶ 30.) None of the Costa Rican accounts ever returned any of those funds to the Cambridge Bank Accounts. Additionally, Larrick withdrew approximately $116,615 in cash and spent approximately $34,805 on various personal expenses, including food and entertainment, Ubers, airline travel, Airbnb rentals, hotels, and video games. Additionally, approximately $388,942 was used to make Ponzi-like payments to Cambridge Pool Participants. (*Id.*)

14. For example, on April 20, 2021, two customers deposited funds totaling $20,424 into the Wells Fargo Account. (*Id.* at ¶ 31.) Pool Participant TD deposited $5,000 via check and noted in the memo field that the funds were intended for "Options Investing." Pool Participant JD deposited $15,424 via check into the Wells Fargo Account noting in the memo that the funds were intended for "Oil Options." On the same day as those deposits, Larrick, as the sole signatory on the account, caused $18,000 to be wired to a bank account in Costa Rica. (*Id.*) Similarly, on July 16, 2021, Pool Participant SG deposited $7,200 via check into the Wells Fargo Account. The memo indicated that the deposit was intended for "Oil Futures." Four days later, Larrick caused $8,879.24 to be wired to another bank account in Costa Rica. (*Id.* at ¶ 32.)

**Cambridge Issued False Account Statements**

15. Pool Participants who deposited funds with Cambridge received an email from info@cambridgefinancials.com providing an ID password and Account Number to access their trading statements through Cambridge's online platform. (*Id.* at ¶ 33.) The trading statements accessible through Cambridge's online portal purported to reflect deposits made by the Pool

Participants as well as transaction-level details related to purported trades in futures and options made by Cambridge, including the date, whether the transaction is a buy or sell, strike price, contract expiration, underlying commodity, whether it is a call or put, purchase price, market value, sell premium, "Total Trade Sell," and commission. (*Id.* at ¶ 34.) In addition, the Account Statements contained a "Transaction Summary" purporting to reflect the amount of "Active Purchases," "Total Market Value," "Deposits," and "Earnings." (*Id.*)

16. These online account statements were fake and purported to reflect trading activity that never occurred. (*Id.* at ¶ 35.) For example, Pool Participant RM's fake online account statement reflected "Earnings" of $569,508 on deposits totaling $60,000 during the approximately nine-month period of September 2021 to June 2022. (*Id.* at ¶ 36.) Pool Participant SM's fake online account statement reflected "Earnings" of $1,619,096 over the period of May 2021 through June 2022 based on deposits totaling $141,000. (*Id.*) These "Earnings" were false because there was no trading, as promised, and no profits earned from trading or otherwise. (*Id.*)

**Defendants' Fraudulent Scheme Unravels**

17. During the Relevant Period, when a Pool Participant requested the return of his funds, Cambridge would suggest that, instead of withdrawing funds, the Pool Participant should reinvest the funds into new "blocks" of futures or options contracts. (*Id.* at ¶ 37.) Cambridge would also make excuses as to why it could not process a requested withdrawal and/or engaged in other conduct designed to delay payouts as long as possible, such as failing to respond to telephone calls of Pool Participants seeking withdrawal. (*Id.* at ¶ 38.) As a result of this conduct, despite repeated requests by Pool Participants many Pool Participants were not able to withdraw their funds. Indeed, of the $3,644,817.52 deposited by Pool Participants only $388,942 (approximately 10%) was returned to Pool Participants. (*Id.* at ¶ 39.) In or around the summer of 2022, Cambridge ceased

communicating entirely with certain Pool Participants seeking returns of their funds. (*Id.* at ¶ 40.) Those Pool Participants discovered that Cambridge's telephone lines were disconnected and that the Cambridgefinancials.com website, including the customer portal where Pool Participants could access their account statements, had stopped working. (*Id.*)

**Cambridge Failed to Register with the Commission**

18. During the Relevant Period, Cambridge was acting as an unregistered CPO by soliciting funds from individuals for a commodity pool for the purposes of trading futures and options. (*Id.* at ¶ 41.) Cambridge used telephone, emails, wire transfers, internet, and other means or instrumentalities of interstate commerce to solicit, accept and receive Pool Participants' funds for the purposes of trading futures and options. (*Id.* at ¶ 42.) During the Relevant Period, Cambridge was never registered as a CPO and was not exempt or excluded from registration as a CPO. (*Id.* at ¶ 43.)

**Larrick is a Controlling Person and Agent of Cambridge**

19. Cambridge is a single-member limited liability company formed in Texas. (*Id.* at ¶ 44.) Larrick formed Cambridge with the Texas Secretary of State, designated himself as Cambridge's registered agent, and provided a family member's residential address as the registered office address for Cambridge. (*Id.*) Larrick also opened and was the sole signatory on the Cambridge Bank Accounts. (*Id.* at ¶ 45.) At various times, Larrick represented to the banks holding the Cambridge Bank Accounts that he was the sole owner or managing member of Cambridge. (*Id.*) Larrick authorized all transactions in the Cambridge Bank Accounts. (*Id.* at ¶ 46.) As such, Larrick is liable for Cambridge's violations of the Act and Regulations pursuant to 7 U.S.C. § 13c(b), because he controlled Cambridge and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Cambridge's violations. (*Id.* at ¶ 47.)

20. Each of the actions taken by Larrick, as described herein, were within the scope of his employment or office with Cambridge. (*Id.* at ¶ 48.) As such, Larrick was acting as an agent of Cambridge. (*Id.*)

**B. Conclusions of Law**

**Jurisdiction and Venue**

21. This Court has jurisdiction over this action pursuant to 7 U.S.C. § 13a-l(a), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce complaint with the Act, or any rule, regulation, or order thereunder.

22. Venue properly lies with this Court under 7 U.S.C. § 13a-1(e) because Defendants transacted business in this District, and the acts and practices in violation of the Act occurred within this District.

**Fraud by Misappropriation, Misrepresentations and Omissions, and False Statements (Count 1)**

23. By the conduct described in paragraphs 1–20 above, Cambridge violated 7 U.S.C. § 6b(a)(1)(A)–(C) by, through use the mails or any means or instrumentality of interstate commerce, directly or indirectly: (i) knowingly or recklessly misappropriating Pool Participant funds; (ii) making material misrepresentations and omissions with scienter regarding, among other things, the profitability of trading commodities with Cambridge, that Pool Participant funds would be used to trade futures and options, and that Pool Participants could withdraw their funds at any time; and (iii) issuing false account statements to conceal Defendants' fraudulent conduct. Larrick violated 7 U.S.C. § 6b(a)(1)(A), (C), by, through use of the mails or any means or instrumentality

of interstate commerce, directly or indirectly, knowingly or recklessly misappropriating Pool Participant funds.

**Options Fraud (Count 2)**

24. By the conduct described in paragraphs 1–20 above, Cambridge violated 7 U.S.C. 6c(b) and 17 C.F.R. § 33.10 by, through use of the mails or any means or instrumentality of interstate commerce, directly and/or through its officers, employees or agents, among other things: (i) misappropriating Pool Participant funds; (ii) making material misrepresentations and omissions with scienter regarding, among other things, the profitability of trading commodities with Cambridge, that Pool Participant funds would be used to trade futures and options, and that Pool Participants could withdraw their funds at any time; and (iii) issuing false account statements to conceal it's fraudulent conduct. Larrick violated 7 U.S.C. 6c(b) and 17 C.F.R. § 33.10 by, through use of the mails or any means or instrumentality of interstate commerce, among other things, misappropriating Pool Participants' funds.

25. Defendants engaged in the acts and practices described above willfully or with reckless disregard for the truth.

**Fraud and Deceit by a CPO (Count 3)**

26. By the conduct described in paragraphs 1–20 above, Cambridge violated 7 U.S.C. § 6o(1) by (A) acting as a CPO, as defined by 7 U.S.C. § 1a(11), by soliciting funds, securities, or property for a pooled investment vehicle for the purpose of trading in commodity interests, including futures and options, and (B) while acting in that capacity, through use of the mails or any means or instrumentality of interstate commerce: (i) misappropriating Pool Participant funds; (ii) making material misrepresentations and omissions with scienter regarding, among other things, the profitability of trading commodities with Cambridge, that Pool Participant funds would be used

to trade futures and options, and that Pool Participants could withdraw their funds at any time; and (iii) issuing false account statements to conceal its fraudulent conduct.

**Failure to Register as a CPO (Count 4)**

27. By the conduct described in paragraphs 1–20 above, Cambridge violated 7 U.S.C. § 6m(1) by (A) acting as a CPO, as defined by 7 U.S.C. § 1a(11), by soliciting funds, securities, or property for a pooled investment vehicle for the purpose of trading in commodity interests, including futures and options (B) while acting in that manner, using the mails or other means or instrumentalities of interstate commerce in connection with its business as a CPO without being registered with the Commission as such.

28. Larrick controlled Cambridge, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Cambridge's conduct in violation of the Act. Therefore, under 7 U.S.C. § 13c(b), Larrick is liable for Cambridge's violations of 7 U.S.C. § 6m(1).

**Failure to Operate the Pool as a Separate Entity and Failure to Receive Pool Participants Funds in the Pool's Name (Count 5)**

29. By the conduct described in paragraphs 1–20 above, Cambridge violated 17 C.F.R. § 4.20(a)(1), (b) by failing to operate the Pool as a legal entity separate from Cambridge and failing to receive Pool Participant funds in the Pool's name.

**Larrick is a Controlling Person and Agent of Cambridge**

30. The foregoing acts, misrepresentations, omissions, misappropriations, falsities, solicitations, and failures occurred within the scope of Larrick's employment or office with Cambridge. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Cambridge is liable for Larrick's violations of Count 1 (7 U.S.C. § 6b(a)(1)(A), (C)) and Count 2 (7 U.S.C. 6c(b) and 17 C.F.R. § 33.10).

31. Larrick controlled Cambridge, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Cambridge's conduct in violation of the Act and Regulations. Therefore, under 7 U.S.C. § 13c(b), Larrick is liable for Cambridge's violations of Count 1 (7 U.S.C. § 6b(a)(1)(A)–(C)), Count 2 (7 U.S.C. 6c(b) and 17 C.F.R. § 33.10), Count 3 (7 U.S.C. § 6o(1)), Count 4 (7 U.S.C. § 6m(1)), and Count 5 (17 C.F.R. § 4.20(a)(1), (b)).

32. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations. Accordingly, the Court is by separate final judgment ordering the following:

## II. PERMANENT INJUNCTION

33. Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, Defendants are permanently restrained, enjoined and prohibited from directly or indirectly:

a. In or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery on or subject to the rules of a designated contract market, for or on behalf of any other person, cheating or defrauding, or attempting to cheat or defraud, any other person, willfully issuing or causing to be issued any false report, or willfully deceiving or attempting to deceive any other person, in violation of 7 U.S.C. § 6b(a)(1)(A)–(C);

b. In or in connection with a commodities option transaction, cheating or defrauding, or attempting to cheat or defraud, other persons, making or causing to be made any false report, or deceiving or attempting to deceive any other person by any means whatsoever, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10;

c. Using the mails or other means or instrumentalities of interstate commerce to directly or indirectly employ a device, scheme, or artifice to defraud clients or prospective clients, or engage in transactions, practices, or courses of business which operate as a fraud or deceit upon clients or prospective clients, in violation of 7 U.S.C. § 6o(1)(A)–(B);

d. Using the mails or other means or instrumentalities of interstate commerce to engage in a business that is of the nature of a commodity pool without being registered as a CPO, in violation of 7 U.S.C. § 6m(1); and/or

e. Operating a commodity pool without causing it to be a legal entity separated from the CPO or receiving pool funds in any name other than that of the pool, in violation of 17 C.F.R. § 4.20(a)(1), (b).

34. Defendants are also permanently restrained, enjoined, and prohibited from, directly or indirectly:

a. Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40));

b. Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3), for Defendants' own account or for any account in which they have a direct or indirect interest;

c. Having any commodity interests traded on Defendants' behalf;

d. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9); and/or

g. Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## III. RESTITUTION, DISGORGEMENT, CIVIL MONETARY PENALTY

### A. Restitution

35. Defendants shall pay, jointly and severally, restitution in the amount of three million two hundred fifty-five thousand, eight hundred seventy-five dollars ($3,255,875) ("Restitution Obligation"). Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of the final judgment and shall be determined by using the Treasury Bill rate prevailing on the date of entry of the judgment pursuant to 28 U.S.C. § 1961.

36. The amounts payable to each Pool Participant shall not limit the ability of any Pool Participant from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any Pool Participant that exist under state or common law.

37. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each Pool Participant who suffered a loss is explicitly made an intended third-party beneficiary of this Order and the final judgment and may seek to enforce obedience to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance therewith and to hold Defendants in contempt for any violations of any provision.

**B. Civil Monetary Penalty**

38. Defendants shall pay, jointly and severally, a civil monetary penalty in the amount of nine million seven hundred sixty-seven thousand six hundred twenty-five dollars ($9,767,625) ("CMP Obligation"). Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of the final judgment and shall be determined by using the Treasury Bill rate prevailing on the date of entry of the judgment pursuant to 28 U.S.C. § 1961.

39. Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

MMAC/ESC/AMK326
Commodity Futures Trading Commission
Division of Enforcement 6500 S. MacArthur Blvd. HQ Room 181
Oklahoma City, OK 73169
(405) 954-6569 office
(405) 954-1620 fax

9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**C. Provisions Related to Monetary Sanctions**

40. Partial Satisfaction: Acceptance by the CFTC of any partial payment of Defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order and the final judgment, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

## IV. MISCELLANEOUS PROVISIONS

41. Notice: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

**Notice to CFTC:**
Charles Marvine
Deputy Director, Division of Enforcement
Commodity Futures Trading Commission
2600 Grand Boulevard
Suite 210
Kansas City, MO 64108

**Notice to Defendants:**
Cambridge Financial Advisors LLC

c/o Walter Larrick
Santa Ana, 50 M Al Norte Del Restaurante De Comida Caribena
Maxis, Case Con Porton Negro Y Paredes Naranja A Mano Izquierda
San Jose, Santa Ana, Santa Ana
10901 – Costa Rica

All such notices to the CFTC shall reference the name and docket number of this action.

42. Change of Address/Phone: Until such time as Defendants satisfy in full their Restitution Obligation and CMP Obligation as set forth in this Order and the final judgment, Defendants shall provide written notice to the CFTC by certified mail of any change to their telephone number and mailing address within ten calendar days of the change.

43. Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

44. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Order and the final judgment and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order or the judgment.

45. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under the authority or control of any of Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

**SO ORDERED** on this **16th day** of **October 2026**.

Reed O'Connor
CHIEF UNITED STATES DISTRICT JUDGE